# Illinois Official Reports

## Appellate Court

***People v. Douglas*, 2014 IL App (5th) 120155**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KURTIS L. DOUGLAS, Defendant-Appellant. |
| District & No. | Fifth District<br>Docket No. 5-12-0155 |
| Filed | March 18, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal, defendant's convictions for driving while his license was revoked and stalking were upheld over defendant's contentions that his guilt was not proven beyond a reasonable doubt and that the new stalking statute unconstitutionally fails to require a culpable mental state, since the circumstantial evidence that defendant was driving a family vehicle was sufficient to sustain his conviction for driving while his license was revoked, and despite the victim's recanted statements, the jury's verdict indicated that it found the victim's prior inconsistent statements more reliable than her in-court testimony and sufficient to support defendant's convictions for stalking; furthermore, an interpretation of the new stalking statute as being intended to punish only unlawful conduct is consistent with the legislature's purpose of protecting victims of domestic abuse. |
| Decision Under Review | Appeal from the Circuit Court of Fayette County, No. 11-CF-95; the Hon. Stephen G. Sawyer, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal    Michael J. Pelletier, Alan D. Goldberg, and Darren E. Miller, all of State Appellate Defender's Office, of Chicago, and Kathryn Shephard, law student, for appellant.

Joshua Morrison, State's Attorney, of Vandalia (Patrick Delfino, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel    JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.
Presiding Justice Welch and Justice Cates concurred in the judgment and opinion.

# OPINION

¶ 1    After a jury trial in the circuit court of Fayette County, defendant, Kurtis L. Douglas, was convicted of driving while license revoked (625 ILCS 5/6-303(d) (West 2008)), two counts of stalking (720 ILCS 5/12-7.3(a)(1), (a)(2) (West 2010)), and aggravated assault (720 ILCS 5/12-2(c)(1) (West 2010)). The trial court merged the two stalking counts, found the aggravated assault to be a lesser-included offense to stalking, and sentenced defendant to three years in the Department of Corrections for driving while license revoked and a concurrent three-year term for stalking. The issues raised on appeal are: (1) whether the State proved defendant guilty beyond a reasonable doubt of driving while license revoked, (2) whether the State proved defendant guilty beyond a reasonable doubt of stalking, and (3) whether a new stalking statute under which defendant was charged is constitutional. We affirm.

¶ 2    FACTS

¶ 3    On July 19, 2011, defendant's wife, Jayma, called 911 to report that defendant had a knife, pointed it at her, and threatened to kill her. In response, Deputy Greg Kline arrived at the residence where defendant and Jayma lived with their seven children. Defendant and Jayma had been married for five years. The parties had one biological child and the other six children were from previous relationships. At trial, Kline testified that when he arrived at the residence, Jayma told him defendant pointed a knife at her and threatened to kill her. Jayma showed Kline a knife inside a kitchen drawer and identified it as the knife with which defendant threatened her. Jayma gave Kline a written statement which was introduced at trial and stated as follows:

> "[Defendant] and I got into a verbal argument[.] I wanted to leave, he got more angry and told me my kids were worthless pieces of shit. I got angry and said that he needed to leave my kids out of it. He came over to the drawer and pulled out a knife and held it

up to me and said he would kill me. I then picked up my phone and dialed 911 at 12:11 p.m. As soon as I called police he took off and said I would pay. Held a black handled approx. 9" blade in his right hand."

¶ 4 Jayma told Deputy Kline that defendant was possibly at Crystal Anderson's house, located at 117 South Washington, and that he had taken the van keys when he left the residence. Jayma told Kline the van was maroon in color. The family van was not at Jayma's when Kline arrived.

¶ 5 Kline went to Anderson's house, which was about "a quarter mile" away from Jayma's residence. Kline saw the van parked outside Anderson's residence and defendant was inside. Kline admitted that he never saw defendant driving the van. A certified copy of defendant's driving abstract was admitted into evidence. By agreement of the parties, the judge informed the jury that defendant's driving privileges were revoked on July 19, 2011.

¶ 6 Jayma testified that on July 19, 2011, she and defendant had a verbal argument during which she called 911. She admitted that she told the operator that defendant pointed a knife at her; however, Jayma recanted her previous statement and said that defendant did nothing more than verbally argue with her on the day in question. Jayma admitted that she identified the knife in People's Exhibit 5 to Kline as the knife with which defendant threatened her, but explained that she lied to the police about the knife incident because she just wanted defendant to leave, and defendant did leave after she made the phone call. Jayma testified at trial that defendant took the keys to the 1999 Ford Windstar van with him when he left. She believed the van was gone from the front of her residence after the argument.

¶ 7 Jayma also admitted there was an incident on August 23, 2010, between her and defendant after which she called the police. On August 23, 2010, she told the police defendant choked her, punched her, and dug his fingernails into her eyes. Defendant was charged with domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2008)) on September 8, 2010. That case went to trial on July 25, 2011, and defendant pled guilty. As defendant was leaving the courtroom on July 25, 2011, he told Jayma that she could tell his children that she killed their father. Jayma reported the incident to the police and she gave a written statement, introduced into evidence, which specifically stated, "[Defendant] was in court this morning and after judge got done saying what she had to say he walked past me and said you can tell my kids you killed their father." However, during the instant trial, Jayma recanted and said "[h]onestly nothing" happened on August 23, 2010. Both of the stalking counts with which defendant was charged alleged a "course of conduct" stemming from the alleged incidents on July 19, 2011, and August 23, 2010.

¶ 8 Deputy Sherri Miller testified that on July 25, 2011, Jayma and her mother-in-law appeared at the police station and gave Miller the written statement previously set forth concerning how she should tell his kids she killed him. At the time she came to give the statement, Jayma told Miller that she was in court because her husband had been arrested for holding a knife to her throat. Jayma did not say whether the allegations were true or false.

¶ 9 A certified conviction for domestic battery was admitted into evidence stemming from the August 23, 2010, incident. Defense counsel objected on the basis that Jayma testified the incident never occurred. The trial court overruled the objection. A discussion then ensued about what aspects of the convictions should be published to the jury. The trial court was

concerned that the allegations of choking, punching, and gouging of eyes were mere allegations, and the trial court could not be sure what the factual basis for the plea was. Ultimately the trial court decided to inform the jury that defendant pled guilty to the charge of domestic battery in which Jayma was the victim without going into specifics.

¶ 10 The defense offered no evidence or testimony. In closing, defense counsel argued no one ever saw defendant drive the van and, therefore, the State failed to prove him guilty of driving while license revoked. Defense counsel also argued that Jayma testified that neither the alleged 2010 nor 2011 incident occurred. With regard to the July 2011 incident, defense counsel argued that it made no sense that defendant would return the knife with which he threatened Jayma to the drawer before leaving the house.

¶ 11 The jury found defendant guilty on all counts. The trial court sentenced defendant to three years on driving while license revoked (count I) and a concurrent three-year term on stalking based upon fear for safety (count II). The trial court did not sentence defendant on stalking based upon emotional distress (count III), finding that count merged with count II. The trial court also did not sentence defendant on aggravated assault (count IV), finding it a lesser-included offense. Defendant filed a motion for a new trial and a motion to reconsider, both of which were denied. Defendant then filed a timely notice of appeal.

¶ 12                                             ISSUES
¶ 13                          I. DRIVING WHILE LICENSE REVOKED
¶ 14 The first issue we are asked to address is whether the State proved defendant guilty of driving while license revoked. Defendant contends the State failed to prove by either direct or circumstantial evidence that he drove the Ford van he was alleged to have driven. Defendant argues no one saw him drive the van, no one saw him inside it, and the State failed to establish that the van found at the location Jayma told police they might be able to find defendant was the same vehicle that defendant allegedly drove from his home. The State responds that the jury's conclusion that defendant drove the van while his license was revoked was neither inherently impossible nor unreasonable. We agree with the State.

¶ 15 Where a defendant challenges the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217, 824 N.E.2d 262, 267 (2005). It is the function of the trier of fact to weigh and resolve conflicts in the evidence and draw reasonable inferences therefrom, and we will not overturn a defendant's conviction based upon insufficient evidence unless the proof is so improbable or unsatisfactory that a reasonable doubt exists concerning the defendant's guilt. *People v. Cardamone*, 381 Ill. App. 3d 462, 512, 885 N.E.2d 1159, 1198 (2008). A person commits the offense of driving while license revoked when he drives a motor vehicle on a highway of this state at a time when his driver's license is revoked. 625 ILCS 5/6-303(a) (West 2010).

¶ 16 Just as "[o]bservation of the defendant in the act of driving is not an indispensable prerequisite to conviction of driving while intoxicated, provided the act of driving while

- 4 -

intoxicated is established by other credible and substantial evidence, either direct or circumstantial" (*People v. Toler*, 32 Ill. App. 3d 793, 799, 336 N.E.2d 270, 275 (1975)), it is not necessary that a defendant actually be seen driving a vehicle in order to be convicted of driving while license revoked. *People v. Mattison*, 149 Ill. App. 3d 816, 500 N.E.2d 1103 (1986). In *Mattison*, it was enough to establish that the defendant was driving while his license was suspended or revoked where the evidence showed the defendant was in sole possession of the vehicle, the keys were in the ignition, he was attempting to start the car when police arrived, and his wallet was in the vehicle. *Mattison*, 149 Ill. App. 3d at 819, 500 N.E.2d at 1106.

¶ 17　　In the instant case, defendant's wife called 911 to report that defendant pulled a knife and threatened her. When the sheriff's department arrived minutes later, defendant's wife told the responding deputy that defendant took the keys and left in their 1999 Ford Windstar maroon van and he might be at Crystal Anderson's house. When the police arrived at Anderson's, a maroon van was parked outside. While defendant contends that this alone was not sufficient to find him guilty of driving while license revoked, we find sufficient circumstantial evidence to support the jury's verdict.

¶ 18　　Defendant does not dispute that his license was revoked on the date in question. The parties stipulated that defendant's driving privileges were revoked and the judge so informed the jury. Furthermore, the evidence established that defendant took the keys to the van, the van was gone from the house he shared with his wife, and both the van and defendant were found at Crystal Anderson's house, where defendant's wife told the police they might be able to locate defendant. The fact that Deputy Kline did not specifically identify the van he found at Anderson's home as a 1999 Ford Windstar is not enough to reverse defendant's conviction. Kline's testimony was sufficient to establish that the van found at Anderson's was the van Jayma reported missing from her home. We also point out that defense counsel specifically argued to the jury that because no one actually saw defendant driving the van, there was not sufficient evidence to find defendant guilty beyond a reasonable doubt. The jury rejected this argument. After careful consideration, we find that when reviewing the evidence in the light most favorable to the State, there was sufficient circumstantial evidence to find defendant guilty beyond a reasonable doubt of driving while license revoked.

¶ 19　　　　　　　　　　　　　　　　　　II. STALKING

¶ 20　　The next issue we are asked to address is whether the State proved defendant guilty of stalking. Defendant argues the State failed to prove him guilty as to both counts II and III. While defendant attempts to raise two separate issues, we choose to address them together because both issues revolve around defendant's contention that Jayma's prior inconsistent statement was insufficient to establish defendant's guilt.

¶ 21　　Pursuant to section 12-7.3 of the Criminal Code of 1961, stalking is defined in pertinent part as follows:

"(a) A person commits stalking when he or she knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to:

 (1) fear for his or her safety or the safety of a third person; or

 (2) suffer other emotional distress.

(a-3) A person commits stalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions follows another person or places the person under surveillance or any combination thereof and:

 (1) at any time transmits a threat of immediate or future bodily harm *** and the threat is directed towards that person or a family member of that person; or

 (2) places that person in reasonable apprehension of immediate or future bodily harm *** of that person or a family member of that person." 720 ILCS 5/12-7.3(a), (a-3) (West 2010).

¶ 22 The stalking counts stemmed from two alleged incidents between defendant and Jayma on July 19, 2011, and August 23, 2010. The information actually alleges the incorrect date of August 3, 2010; however, defendant did not challenge the sufficiency of the charging instrument. We point out the inconsistency merely for clarification purposes. Count II alleged in pertinent part:

"[D]efendant knowingly engaged in a course of conduct directed at Jayma Douglas in that he strangled and punched Jayma Douglas on August 3, 2010, and on July 19, 2011, defendant held a knife and pointed it at Jayma Douglas while threatening to kill her, and he knew or should have known that this course of conduct would cause a reasonable person to fear for her safety[.]"

¶ 23 Count III alleged in pertinent part:

"[D]efendant knowingly engaged in a course of conduct directed at Jayma Douglas in that he strangled and punched Jayma Douglas on August 3, 2010, and on July 19, 2011, defendant held a knife and pointed it at Jayma Douglas while threatening to kill her, and he knew or should have known that this course of conduct would cause a reasonable person to suffer emotional distress."

¶ 24 Defendant first claims that the State failed to prove him guilty beyond a reasonable doubt because Jayma testified under oath at trial that defendant did not commit the two alleged acts which comprised the underlying course of conduct. Defendant argues we must reverse his conviction because Jayma's recanted statement was the sole evidence against him and insufficient to support the jury's finding of guilt beyond a reasonable doubt. Defendant insists there was insufficient evidence of his guilt because a prior inconsistent statement, even one found inherently reliable under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2010)), is insufficient to establish guilt beyond a reasonable doubt. We disagree.

¶ 25 Defendant relies on *People v. Parker*, 234 Ill. App. 3d 273, 600 N.E.2d 529 (1992), in support of this contention. In that case, the defendant was convicted of murder, armed violence, attempted murder, and aggravated battery, and the only evidence against him was the

prior inconsistent statements of three State witnesses that were disavowed by all three at trial. *Parker*, 234 Ill. App. 3d at 273-74, 600 N.E.2d at 530. *Parker* is distinguishable from the instant case because the defendant's conviction was reversed on the basis that the prior inconsistent statements of the three recanting witnesses were the only evidence against the defendant and the statements were so seriously impeached at trial as to cast doubt on their authenticity. *Parker*, 234 Ill. App. 3d at 280, 600 N.E.2d at 534. All three disavowed statements were prepared by the police; none were prepared in the witnesses' own hand. Furthermore, the first witness, Wiley, testified he signed the statement on the seventh day of a 2½-month hospital stay while recovering from surgery and still in a great deal of pain and did so only " 'to get [the detective] out of the hospital room with all those questions.' " *Parker*, 234 Ill. App. 3d at 276, 600 N.E.2d at 531. The second witness, Coleman, a juvenile at the time he signed the statement, testified several officers came to his home with the prepared statement and threatened to arrest him if he did not sign the statement. *Parker*, 234 Ill. App. 3d at 277, 600 N.E.2d at 532. The third witness, James, testified that the statement he gave to the police was not only falsified, but also beaten and forced from him by the police. *Parker*, 234 Ill. App. 3d at 278, 600 N.E.2d at 532.

¶ 26    Our review of *Parker* shows that it in no way stands for the proposition that a recanted statement can never be sufficient evidence to support a defendant's conviction. It merely states that "where the only evidence that inculpated defendant was prior inconsistent statements which were directly contradicted by the alleged declarents [*sic*] at trial, the credibility of this evidence was greatly reduced." *Parker*, 234 Ill. App. 3d at 280, 600 N.E.2d at 534.

¶ 27    In the instant case, Jayma recanted, but her previous statements were not impeached in the manner in which the statements were in *Parker*. Jayma hand-wrote her statements to police, and there are no accusations of police brutality or misconduct. Here, the evidence showed that on July 19, 2011, Jayma called 911 and reported that defendant pulled a knife and pointed it at her. When Deputy Kline responded to the 911 call minutes later, Jayma told him that defendant pulled a knife on her and threatened to kill her. Jayma identified a knife in a drawer as the knife defendant used to threaten her. Deputy Kline took a picture of the knife and the picture was introduced at trial. Jayma also wrote a statement in which she explained that defendant pulled a knife on her and threatened to kill her. The written statement was admitted under section 115-10.1 of the Code. In August 2010, Jayma told the police that defendant choked her, punched her, and dug his finger into her eyes. Defendant pled guilty to the domestic battery charge stemming from that incident. Jayma admitted making a statement to the police after defendant appeared in court on the August 23, 2010, domestic battery charge. However, at trial Jayma testified that the only thing that occurred on July 19, 2011, was a verbal argument. She said she made up the story about the knife because she wanted defendant to leave, and when she called 911, defendant did, in fact, leave.

¶ 28    A criminal conviction will not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt. *People v. Maggette*, 195 Ill. 2d 336, 353, 747 N.E.2d 339, 349 (2001). Contrary to defendant's assertions, even if there is no corroborative evidence, a recanted prior inconsistent statement admitted under section 115-10.1 can support a conviction. *People v. Craig*, 334 Ill.

App. 3d 426, 778 N.E.2d 192 (2002); *People v. Morrow*, 303 Ill. App. 3d 671, 708 N.E.2d 430 (1999). *Morrow* held that the witness's previous inconsistent statements alone were sufficient to prove defendant's guilt beyond a reasonable doubt. *Morrow*, 303 Ill. App. 3d at 677, 708 N.E.2d at 436. The witness in question was the defendant's girlfriend. Her statements to the police and her grand jury testimony were virtually identical, specifically that the victim paid the witness and another codefendant for sex. While the three were in the victim's car, the codefendant attempted to steal the victim's wallet. The victim realized what the codefendant was doing, and a struggle ensued. Both the witness and the codefendant exited the vehicle and ran to the defendant's car, which was parked behind the victim's car. The witness testified the defendant went to the victim's car and shot the victim. *Morrow*, 303 Ill. App. 3d at 674-75, 708 N.E.2d at 434.

¶ 29     At trial, however, the witness denied knowing the victim and being with him on the night of the murder. While some corroborative evidence existed (a condom, a straw, and the victim's wallet), the court found that even if there was no corroborative evidence, the witness's prior inconsistent statements alone were enough to uphold the defendant's conviction. *Morrow*, 303 Ill. App. 3d at 677, 708 N.E.2d at 436. As long as a prior statement meets the test of section 115-10.1, a finding of reliability and voluntariness is automatically made and no additional analysis is needed; it is the jury's decision to assign weight to the statement and to decide whether the statement was voluntary after hearing the declarant's inconsistent testimony. *Morrow*, 303 Ill. App. 3d at 677, 708 N.E.2d at 436 (citing *People v. Pursley*, 284 Ill. App. 3d 597, 609, 672 N.E.2d 1249, 1257 (1996)).

¶ 30     It is within the province of the jury to assess the credibility of witnesses, weigh evidence presented, resolve conflicts in evidence, and draw reasonable inferences therefrom, and its determination is entitled great deference. *People v. Moss*, 205 Ill. 2d 139, 164-65, 792 N.E.2d 1217, 1232 (2001). Once a jury returns a guilty verdict based upon a prior inconsistent statement, not only is the reviewing court under no obligation to determine whether the declarant's testimony was "substantially corroborated" or "clear and convincing," but it may not even undertake that analysis. (Internal quotation marks omitted.) *Morrow*, 303 Ill. App. 3d at 677, 708 N.E.2d at 436 (quoting *People v. Curtis*, 296 Ill. App. 3d 991, 999, 696 N.E.2d 372, 378 (1998)).

¶ 31     In light of the foregoing, we find the evidence was sufficient in this case to find defendant guilty of stalking. The cases on which defendant relies are older cases and in no way hold that, as a matter of law, a recanted prior inconsistent statement cannot support a criminal conviction. Here, it is clear why Jayma might change her story, as do so many victims of domestic abuse. She and defendant had been married five years and had one biological daughter and a total of seven children between them. Jayma was the breadwinner of the family and relied on defendant for child care. The jury was in the best position to weigh Jayma's credibility. Our review of the transcript shows Jayma's attempt to recant either incident fell flat. The verdict indicates the jury found her prior inconsistent statements more reliable than her in-court testimony. We also point out that there was some corroborating evidence here, namely, the picture of the knife that was submitted into evidence.

¶ 32    Defendant also contends that there is no connection between the two acts which formed the course of conduct for stalking; however, the statute set forth above does not require that the acts which form the course of conduct be related. Defendant concedes as much. In any event, we agree with the State that defendant's claim that the acts are not connected is in error because it is clear that both acts were violent acts or threats of violence directed toward his wife.

¶ 33    We also reject defendant's argument that the 11-month gap between the acts precludes a conviction for stalking. While this was a somewhat unconventional charge, there is nothing in the statute that requires the acts that form the basis of the charge be performed within a certain time frame. Jayma was distressed enough that she contacted the police about both incidents that form the basis of the charges. After careful consideration, we find there was sufficient evidence to find defendant guilty of stalking.

¶ 34                                III. CONSTITUTIONALITY

¶ 35    The final issue raised on appeal is whether the stalking statute is constitutional. Defendant contends section 12-7.3(a) is unconstitutional because it fails to require proof of a culpable mental state, rendering it capable of punishing wholly innocent conduct unrelated to the statute's purpose. The State first replies that defendant lacks standing to argue that the stalking statute potentially punishes innocent conduct because the "course of conduct" at issue here involved threats and nonconsensual contact. The State insists that defendant has no standing to argue that the stalking statute may conceivably be applied in an unconstitutional manner to others.

¶ 36    In *People v. Aguilar*, 2013 IL 112116, 2 N.E.3d 321, our supreme court rejected the same argument made by the State herein. In that case, the defendant challenged the two statutes under which he was convicted, the Class 4 form of section 24-1.6(a)(1), (a)(3)(A), (d) (720 ILCS 5/24-1.6(a)(1), (a)(3)(A), (d) (West 2008)) and section 24-3.1(a)(1) (720 ILCS 5/24-3.1(a)(1) (West 2008)) of the unlawful possession of a firearm statute. *Aguilar*, 2013 IL 112116, ¶ 11, 2 N.E.3d 321. The supreme court found that the defendant was not arguing that the two sections of the statute violated his personal right to keep and bear arms as guaranteed by the second amendment but, rather, that the statutes themselves facially violate the second amendment and, therefore, cannot be enforced against anyone. *Aguilar*, 2013 IL 112116, ¶ 12, 2 N.E.3d 321.

¶ 37    The supreme court specifically stated:

> " 'One has standing to challenge the validity of a statute if he has sustained or if he is in immediate danger of sustaining some direct injury as a result of enforcement of the statute.' *People v. Mayberry*, 63 Ill. 2d 1, 8[, 345 N.E.2d 97, 101] (1976). Here, the challenged statutes were enforced against defendant in the form of a criminal prosecution initiated by the People of the State of Illinois, and the 'direct injury' he sustained was the entry of two felony convictions for which he was sentenced to 24 months' probation. If anyone has standing to challenge the validity of these sections, it is defendant." *Aguilar*, 2013 IL 112116, ¶ 12, 2 N.E.3d 321.

¶ 38    In the instant case, defendant was convicted of two counts of stalking, but the trial court found the counts merged and sentenced him to three years in prison, his sentence to run concurrent to the three-year sentence he received on count I. Defendant clearly sustained injury as the result of the statute; therefore, relying on *Aguilar*, we find defendant has standing to challenge the constitutionality of section 12-7.3(a) of the stalking statute.

¶ 39    We reject, however, defendant's argument that the statute is unconstitutional because it does not require proof of a culpable mental state and is, therefore, capable of punishing innocent conduct and is in violation of substantive due process. Statutes are presumed constitutional, and the party challenging the constitutionality of a statute carries the burden of proving that the statute is unconstitutional. *People v. Hollins*, 2012 IL 112754, ¶ 13, 971 N.E.2d 504. This court has a duty to construe the statute in a manner that upholds the statute's validity and constitutionality. *Hollins*, 2012 IL 112754, ¶ 13, 971 N.E.2d 504. The constitutionality of a statute is a question of law to be reviewed *de novo. Hollins*, 2012 IL 112754, ¶ 13, 971 N.E.2d 504.

¶ 40    Effective January 1, 2010, our General Assembly added another stalking statute, codified as section 12-7.3 of the Criminal Code of 1961, set forth previously in this opinion. Under this new statute, a "course of conduct" is defined as follows:

> " 'Course of conduct' means 2 or more acts, including but not limited to acts in which a defendant directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to or about, a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet. A course of conduct may include contact via electronic communications." 720 ILCS 5/12-7.3(c)(1) (West 2010).

Defendant contends that because the disjunctive "or" connects the examples of what constitutes a course of conduct, there is no need for the communication to be threatening.

¶ 41    Defendant then goes on to list three hypothetical examples of how innocent conduct could be punishable under section 12-7.3(a). Defendant first contends that when a pharmacist fills a prescription for a customer and tells the customer about the medication's side effects, including the risks of blood clots and death and then one month later, the customer returns for a refill and the pharmacist repeats the potential serious side effects, the pharmacist's innocent conduct could be potentially punishable under the stalking statute because the pharmacist knew or should have known that his or her warnings would cause the customer to fear for his or her safety. However, what defendant fails to consider is that the language of the statute also requires that all communications be "non-consensual." The communication between the pharmacist and the customer is clearly consensual, as it is the customer who initiates contact to get a prescription filled. The other two hypothetical examples offered by defendant, a heating and air-conditioning technician and a doctor, also deal with consensual rather than nonconsensual contact.

¶ 42    An earlier version of the stalking statute also failed to specifically include a culpable mental state but was nevertheless found constitutional in *People v. Bailey*, 167 Ill. 2d 210, 657 N.E.2d 953 (1995). The stalking statute addressed in *Bailey* provided in pertinent part:

"(a) A person commits stalking when he or she transmits to another person a threat with the intent to place that person in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint, and in furtherance of the threat knowingly does any one or more of the following acts on at least 2 separate occasions:

(1) follows the person, other than within the residence of the defendant;

(2) places the person under surveillance by remaining present outside his or her school, place of employment, vehicle, other place occupied by the person, or residence other than the residence of the defendant." 720 ILCS 5/12-7.3(a) (West 1992).

¶ 43    In *Bailey*, the defendants argued that the statute was unconstitutional because it failed to contain the language "without lawful authority." The defendants asserted that the absence of such language made innocent conduct unlawful, violating due process guarantees. *Bailey*, 167 Ill. 2d at 224, 657 N.E.2d at 960.

¶ 44    Our supreme court, however, disagreed and interpreted the statute "as proscribing only conduct performed 'without lawful authority.' " *Bailey*, 167 Ill. 2d at 224, 657 N.E.2d at 960. The supreme court went on to explain:

"We do not believe threatening a person with the requisite intent and in furtherance of the threat following or placing a person under surveillance without lawful authority involves any 'innocent conduct.' *** Further, the fact that the statutes at issue here can be interpreted to punish only unlawful conduct distinguishes this case from those where such an interpretation was not possible." *Bailey*, 167 Ill. 2d at 225, 657 N.E.2d at 961.

¶ 45    The current, new version of the stalking statute, which provides that a defendant who "follows, monitors, observes, surveils, threatens, or communicates" must do so in a nonconsensual manner in order for the contact to be criminal, can similarly be interpreted to punish only unlawful conduct, not consensual, innocent contact. As in *Bailey*, this interpretation is consistent with and furthers the following three important rules:

"(1) a court must ascertain and give effect to the legislature's intent in enacting the statute [citation]; (2) in construing a statute, this court has a duty to affirm the statute's validity and constitutionality if reasonably possible [citations]; and (3) an interpretation that renders a statute valid is always presumed to have been intended by the legislature [citation]." *Bailey*, 167 Ill. 2d at 225, 657 N.E.2d at 960-61.

Here, our interpretation is consistent with our General Assembly's intent in enacting the new legislation redefining stalking.

¶ 46    Prior to the Senate vote on the bill, Senator Hutchinson pointed out that "[a] recent U.S. Department of Justice study said that seventy-six percent of female homicide victims were stalked first, prior to their death. It's terrifying and it's something that we need to do all we can to protect our victims from." 96th Ill. Gen. Assem., Senate Proceedings, May 21, 2009, at 125 (statements of Senator Hutchinson). Our General Assembly's goal in enacting the legislation was not to criminalize any innocent contact, but to protect victims of domestic abuse such as Jayma. After careful consideration, we disagree with defendant that the statute is

unconstitutional. Defendant has failed to convince us that the statute makes innocent conduct unlawful, which would violate due process guarantees. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. Instead, we find section 12-7.3(a) constitutional.

¶ 47                                                    SUMMARY

¶ 48         For the foregoing reasons, we hereby affirm the judgment of the circuit court of Fayette County. The evidence was sufficient for the jury to find defendant guilty of the offenses with which he was charged. We also find the new stalking statute constitutional.

¶ 49         Affirmed